## BANKERS' TRUST CO. v. SCHULZE.
### (No. 7845.)

(Court of Civil Appeals of Texas. Galveston. March 3, 1920. Rehearing Denied April 1, 1920.)

**1. Damages ⬤⟞62(4)—Where lessor breached contract to let defendant cut hay, defendant need not rent other lands.**

Where plaintiff agreed to let defendant cut hay from lands, but excluded him before expiration of the term, defendant is not bound to minimize the damage by leasing other hay lands, but is entitled to recover the full amount of the loss, regardless of the fact that he might have secured other lands.

**2. Landlord and tenant ⬤⟞180(3)—Evidence held to sustain award of damages in favor of lessee of hay lands.**

Where plaintiff prevented defendant from cutting hay on lands which he had fenced, evidence *held* sufficient to sustain the award of damages, it appearing that the lands were fenced, and so were more valuable for haying than surrounding inclosed lands which defendant could have obtained.

**3. Partnership ⬤⟞199—One making contract for benefit of himself and undisclosed partner may sue thereon.**

One making contract in his own name for benefit of himself and an undisclosed partner may sue for the benefit of himself and partner and recover the full amount of the damages.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by B. F. Schulze against the Bankers' Trust Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Andrews, Streetman, Logue & Mobley, of Houston, and W. T. Armstrong, of Galveston, for appellant.

James B. & Charles J. Stubbs and F. Spencer Stubbs, all of Galveston, for appellee.

LANE, J. This suit was brought by appellee, B. F. Schulze, against appellant, Bankers' Trust Company, to recover the sum of $2,000, alleged to be the damage suffered by appellee by reason of a breach on the part of appellant, of the following contract:

"The Bankers' Trust Company, for ·a consideration of one hundred and no/₁₀₀ ($100.00) dollars, leases to B. F. Schulze, of Arcadia, Texas, the privilege of cutting hay off of what is known as Eureka Orchards tract, in the I. R. Lewis survey, in Galveston county, Texas, between this date and November 1st, 1918, said consideration of $100.00 to be paid by said Schulze to the Bankers' Trust Company out of the proceeds of the sale of said hay, as follows:

"$75.00 from the first car of hay shipped, and $25.00 from the second car of hay shipped from said land, and a lien is retained by said Bankers' Trust Company upon all the hay cut off of said tract until said $100.00 is paid.

"It is further understood that the $100.00, agreed upon is to be paid absolutely, and is not in any way affected by the amount of hay cut and sold off·of said tract.

"Signed this the 24th day of September, A. D. 1917.　　Bankers' Trust Company,
　　　　　　　　　"By N. E. Meador, V. P.
　　　　　　　　　"B. F. Schulze."

Appellee alleged that the tract of land leased contained 500 acres; that of said 500 acres there were 175 acres of good hay land; that after appellee had taken possession of the land and cut hay therefrom in the fall of 1917, appellant on or about the 15th day of February, 1918, ejected and excluded him from the land and placed one O. C. Rupe in possession thereof; that had appellee not been dispossessed of said land he would have cut two crops of hay therefrom during the year 1918, before the expiration of his lease, which would have amounted to 175 tons of hay of the value of $20 per ton, and which he could have sold so as to produce a net profit to him of $2,000, all of which he lost by reason of the breach of said contract by appellant. He also alleges full compliance of the contract on his part.

Appellant answered by general demurrer, general denial, and by specially pleading that the contract actually made and entered into between the parties only extended to the 1st day of November, 1917, and that the date "1918" was inserted in the contract through an oversight and a typographical error.

The cause was tried before a jury, to whom the following charge was submitted:

"Unless you believe from the evidence that the date of 'November 1st, 1918,' was inserted in the contract instead of 'November 1st, 1917,' by mutual mistake, accident, or inadvertence, you will return a verdict for the plaintiff, and assess his damages at such a sum as will compensate him for the loss of the crop of hay that he would probably have gathered in 1918 had he not been prevented from doing so by the defendant. In such case the proper measure of damages would be the market value of the crop he would probably have gathered, at the market price at Arcadia at the time, after deducting therefrom the cost of gathering the hay and the preparation for marketing the same, together with the expense of marketing, as may be shown by the evidence.

"If you believe from the evidence that the date 'November 1st, 1918,' was inserted instead of 'November 1st, 1917,' by the mistake, accident, or inadvertence of both parties, you will return a verdict for the defendants."

The verdict of the jury was as follows:

"We, the jury, find for plaintiff, and assess damages in his favor against the Bankers' Trust Company in the sum of one thousand ($1,000.00) dollars."

Judgment was rendered in accordance with the verdict.

[1] It is the contention of appellant, first, that the verdict of the jury and the judg-

ment rendered thereon are without evidence to support them; and, to the contrary, the appellee's own testimony was to the effect that after the breach of the contract he could have leased other lands for producing hay during the year 1918 at 25 cents per ton, thus showing that he could have greatly minimized his damage, and therefore he was not entitled to recover for the entire loss of profits he would have made by cutting hay from the leased land during that year; and, second, that in any event appellee could not recover for more than one-half of the damages sustained, because it was shown that his brother is entitled to one-half of such damages, if any.

The first contention is based upon the assumption that appellee's suit was for special damages and not for general damages, and that in such case the lessee must show that he used reasonable diligence to secure other property of like kind so as to minimize the damages likely to result by reason of the breach of the contract; in other words, that a party injured by a breach of contract must make reasonable exertion to render the injury as light as possible, and that he cannot recover for any loss which he might have avoided with ordinary care and reasonable expense.

We cannot agree with this contention of appellant. The contract which was broken in this case was not one for personal services, nor one which the parties contemplated should be performed with any special means or instrumentalities. It was simply a contract by the terms of which appellant, for a consideration of $100, sold to appellee the privilege of cutting grass or hay then growing and that to be grown, on a certain 500 acres of land for the year 1918. The labor necessary to be performed in harvesting the hay might have been performed by him with his own instrumentalities and labor, or by any other means or agency to which he might have seen fit to intrust the performance of the same. There is nothing in the contract from which it can be assumed that the execution of the same required all or any great portion of appellee's time or his personal attention, or that it was impracticable for him to be engaged in other business and the performance of other contracts contemporaneously with the performance of the contract in controversy. We do not think the rule invoked as to mitigation of damages by subsequent earnings and profits, or by profits which might have been earned by appellee, applies in this case. A distinction is recognized between a case of the character of the one now under consideration and contracts for personal services for a given term at specified wages, and other contracts, the performance of which contemplates the exclusive personal service of the one obligated to perform the same, or contracts which contemplate its performance by or with certain specified instrumentalities at the disposal of the performing contractor, such as employment of clerks, agents, laborers, or domestic servants for a definite period of time, and such employment of the exclusive services of a person and his instrument or instruments by or with which he must necessarily perform the contemplated work.

It has been uniformly held that the rule stated in 13 Cyc. page 72, "A party injured by a breach of contract must make reasonable exertions to render the injury as light as possible, and he cannot recover for any loss which he might have avoided with ordinary care and reasonable expense," is applicable to the latter class of contracts. Harness v. Kentucky Flour Spar Co., 149 Ky. 65, 147 S. W. 934, and cases there cited. But we have found no case where a disappointed party to a contract to do a specific thing or work for a contemplated profit, who of necessity engages in a different or similar business from that which his contract would have furnished, if complied with, or takes other employment from which he makes a profit, is to be considered as doing so for the benefit of the faithless contractor. Harness v. Kentucky Flour Spar Co., supra.

In the case cited, speaking of a question almost identical with the one being here discussed, the court said:

"There was no legal obligation upon the plaintiffs in this case to enter upon the performance of other contracts for the benefit of the defendants. The Supreme Court of Wisconsin in Cameron v. White, supra [74 Wis. 425, 43 N. W. 155, 5 L. R. A. 493], where a contention like that of appellants in this case was made, as we think properly said: 'As the plaintiffs could not enhance the damages against the defendant by their neglect to make the best of what they had on their hands, so they are not bound to lessen the damages by making other contracts, and performing them, and giving the benefit of the performance of such contracts to the defendant.' * * *"

Again:

"There is a well-defined distinction drawn by all the authorities between contracts for hire, or for personal service, and the contracts to do a specific act. In the former case, if the plaintiff gets employment at the same wages, it is plain that he is not damaged, and when he does not his damages are easily ascertained. In the latter species of contract, where the employer refuses to accept the services, or to have the work contracted for performed, or prevents the employé from performing the same in any manner, the usual measure of damages, where the contract relates to the manufacture of an article, or the construction of a building, or the performance of some other specified act, is the difference between the price agreed to be paid and what it would have cost the employé to complete it, provided such cost would be less than the contract price. Field on Law of Damages, § 339. The duty to seek employment is dependent upon the original contract being one of employment or hire. It is not applicable to every

contract. Sedgwick on Damages, § 208. It was held by the Supreme Court of Pennsylvania in Wolf v. Studebaker, 65 Pa. 459, a leading case decided in 1870, that ordinary contracts of hire, and contracts for the performance of some specified undertaking, cannot be governed by the same rule; that in one case the party can earn no more than the wages, and if he gets that his loss will be but nominal, whereas, in the other case, the loss of the party is the loss of the benefit of the contract. The damage may be said to be fixed by the law of the contract the moment it is broken, and cannot be altered by collateral circumstances, independent of and totally disconnected from it, and from the party occasioning it."

The case from which we have quoted discusses questions identical with the questions presented by the appeal in this case, and we think ably and correctly decides the same.

The evidence shows that appellee was engaged, to some extent, in the business of harvesting and marketing hay for profit. He had the right to lease one or many tracts of land from which to gather hay for the market and to realize profits therefrom, if he saw fit to do so, without resting under any obligation, either morally or legally, to apply such profits to the mitigation of the damages suffered by reason of appellant's breach of contract. He had the right to make as few or as many other contracts as he saw fit while executing the contract with appellant; and he is entitled to the profits which he might have made on the contract with appellant, had appellant not breached the contract, and he should be permitted to recover the value of the hay which he could and would have harvested from the leased land had not appellant breached the contract, less all expenses of harvesting and marketing the same, including the personal labor and attention of appellee as was devoted to such harvesting and marketing.

In the case of Harness v. Kentucky Flour Spar Co., supra, in speaking of the measure of damages, the court said:

"The profits which are permitted to be recovered are those which are the direct and immediate fruits of the contract. These are part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement."

We also quote with approval from the case of Brincefield v. Allen, 25 Tex. Civ. App. 258, 60 S. W. 1010, the rule there stated for the measure of damages in such cases as the one before us, as follows:

" * * * The object sought to be obtained in laying down a rule for the measure of damages for breach of contract is to secure an adequate and fair compensation to the injured party for the damages caused him by such breach, when such damages are incidental to and caused by the breach, and may reasonably be supposed to have entered into the contemplation of the parties at the time of entering into the contract."

Again:

"We think it a proposition too plain for argument that the plaintiff in this case, having made a contract from the performance of which he would ordinarily and in the usual course of events have derived profit, is damaged by the breach of said contract, to the extent of the profits he would have received had such contract been performed by the defendant, and that such profits were incident to the contract, and must have been in contemplation of the parties when the said contract was entered into."

Other cases announcing the proper measure of damages in such case as the one under consideration are cited in the case of Harness v. Kentucky Flour Spar Co., above cited.

From what has been said by us, and quoted with approval from the decisions of other courts, it is apparent that we are of the opinion that appellee was not bound to lease other lands for haymaking purposes, so as to mitigate the damages suffered by him by reason of the breach of the contract on the part of appellant, and that the true measure of damages in this case is the net profits appellee could have made from the hay crop on the leased land during 1918.

Many decisions of the courts of Texas are to be found in which it is held that the general rule applicable to cases where a cropper is not permitted to make the crop is that the injured party is entitled to recover the reasonable cash market value of his share of the crops that such party could and would have reasonably grown and gathered on the land during the crop year, less any sum which the cropper may have earned in any other manner by his labor during said period, or by the use of reasonable or ordinary diligence might have earned. Brooks v. Davis, 148 S. W. 1107; Crews v. Cortez, 102 Tex. 111, 113 S. W. 523, 38 L. R. A. (N. S.) 713; Lott v. Ballew, 198 S. W. 645, and cases cited therein. But in most, if not all, of these cases it is specially stated that each case is governed by its peculiar facts. The contracts involved in the cases referred to contemplated a continuous personal service of the cropper in the cultivation of the crop, and cannot be governed by the same rules which govern contract of purchase of certain grass or certain timber, from which it must have been contemplated by both parties that the purchaser purchased the same with a view of making hay and lumber and selling the same and making a profit thereon. We have already expressed our views as to what rule should govern the latter class of contracts, and need not repeat them here.

[2] But independent of the conclusions

already stated, appellant's contention cannot be sustained for the very cogent reason that the evidence supports the verdict and judgment rendered.

While it is true that on cross-examination appellee did testify that had he wanted to he thinks he could have leased as good hay land from other parties as that of appellant at about 25 cents per ton, his testimony as a whole shows that he did not intend to nor did he say that he could have leased land in quantity and quality equal to that leased from appellant, for the reason that he did testify that he had fenced the leased land and that he had cut the grass and weeds therefrom in the fall of 1917, and had thereby increased, by double, the value of the hay thereon for the year 1918.

Edgar Childs testified with reference to the leased land as follows:

"I was there on it in March and it was in good condition; in fact, it was the best grass I had seen in the whole country anywhere—the latter part of March or first of April. I consider that one hundred and seventy-five acre tract especially good hay land. That tract was under fence. The prairie around there wasn't under fence.

"Q. Well, does that make any difference with regard to the hay on it? A. Yes, sir; quite a lot.

"Q. What is the difference? A. Well, they eat it off, and it does not get the start."

H. W. Beaty testified:

"That tract of hay land in the Eureka Orchards tract was better by reason of being fenced; the difference was there was no stock in there to keep the grass eat off. The outside grass wasn't worth anything hardly, and right next to it wasn't even cut on the outside because there wasn't anything there to cut; the cattle eat it up—stock."

John Schulze testified:

"The fence was a benefit to it to keep the stock off of it. The rest of the land around there was practically free range—all that wasn't under cultivation, and then some little out in different places that had cut off hay farms and the like of that, little ten-acre places; that is, out further a piece."

O. C. Crepon, with reference to the leased land, testified:

"Mr. Schulze put up the fence there. You bet you the fencing of that tract improved its possibilities for raising hay, because the land used to get in there, and if there had not been any fence it would be like this floor—like the rest of them. Most of the prairie land around there was unfenced. That land produced about a ton of hay to the acre in 1918."

[3] The contention that appellee could in no event recover for more than one-half of the damages sustained is overruled. It is well settled that where one party makes a contract in his own name, though it be for the benefit of himself and an undisclosed partner, he may bring suit for a breach thereof in his own name. Cleveland & Cameron v. Heidenheimer, 92 Tex. 108, 46 S. W. 30, and authorities there cited.

Having reached the conclusion that no reversible error was committed by the court trying this case, the judgment there rendered is affirmed.

Affirmed.